**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

NATHAN REARDON,

Plaintiff,

      v.

UNITED STATES OF AMERICA,

Defendant.

No. 1:25-cv-00154-LEW

**DEFENDANT UNITED STATES OF AMERICA'S**
**MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)**

Defendant the United States of America, by and through undersigned counsel, moves to dismiss Plaintiff Nathan Reardon's Complaint ("Complaint" or "Compl.," Dkt. #1, Apr. 10, 2025) pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff is a convicted felon. As a result, he is prohibited under federal law from possessing a firearm. *See* Compl. ¶¶ 1-3; 18 U.S.C. § 922(g)(1). Plaintiff's contention that this prohibition violates the Constitution as applied to him fails as a matter of law. Precedent establishes that Section 922(g)(1) is constitutional as applied to him. History and tradition generally supports the disarmament of felons. Accordingly, the Court should grant the Government's motion to dismiss. *See* Fed. R. Civ. P 12(b)(6); *Taker v. Bondi*, 2:24-cv-00369-LEW, 2025 WL 1883701, at *1-2 (D. Me. July 8, 2025).

## I.   FACTUAL BACKGROUND

Plaintiff was sentenced to 20 months imprisonment for five counts of bank fraud on November 2, 2022, in his related federal criminal prosecution docketed 1:21-cr-

00061-LEW.[1] Compl. ¶ 9; Dkt. ##159, 201, 1:21-cr-00061-LEW. His "convictions stem from a non-violent scheme involving fraudulent PPP loan applications during the COVID-19 pandemic." Compl. ¶ 11. Although Plaintiff alleges that he "has no history of violence," *see* Compl. ¶ 12, that statement is inconsistent with evidence of "a road rage incident in 2005 during which, it was alleged, [he] aimed a loaded firearm at the driver of another vehicle." Dkt. #66 at 1, 1:21-cr-00061-LEW. Plaintiff also alleges that, "[s]ince his release, Plaintiff has complied with supervised release conditions. . ." Compl. ¶ 15. That allegation, too, is belied by the record of his criminal prosecution. Plaintiff in fact violated the terms of his supervised release. On October 16, 2023, he was sentenced to 9 more months imprisonment for those violations. Dkt. ##183-185, 1:21-cr-00061-LEW.

Nonetheless, Plaintiff submits that "[n]o historical tradition supports a lifetime firearm ban for non-violent felons" like him. Compl. ¶ 20; *see also id*. ¶¶ 21-24. He accordingly requests a declaratory judgment and permanent injunction that Section 922(g)(1) is unconstitutional as applied to him. Compl. at p. 3.

## II. LEGAL STANDARDS

### A. Federal Rule of Procedure 12(b)(6)

To survive a motion to dismiss for failure to state a claim a complaint must include sufficient factual allegations to show a plausible right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When considering whether the Complaint demonstrates a plausible right to relief, the Court must accept all well-pleaded factual

---

[1]    The Court may take judicial notice of Plaintiff's underlying criminal proceeding. *See* FED. R. EVID. 201; *Lussier v. Runyon*, 50 F.3d 1103, 1114 n.14 (1st Cir. 1995) ("courts may take judicial notice of their own records"); *see also Zenon v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019) (courts may consider "not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice").

allegations as true and views them in the light most favorable to Plaintiff. *Oscasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). However, "[u]nlike factual allegations," conclusory statements and "legal conclusions contained within a complaint are not entitled to a presumption of truth." *Id.* at 10. Applying these standards, if a court finds that a pleading does not show a plausible right to relief, then the moving party's motion to dismiss should be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### B. Overview of Recent Second Amendment Supreme Court Jurisprudence

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law abiding, responsible citizens" to keep firearms in their homes for self-defense. But *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 8 (2022), the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 11, 60. *Bruen* rejected the "two-step" framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Id.* at 17. And *Bruen* "reiterate[d]" the "standard for applying the Second Amendment." *Id.* at

24. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* Second, when a regulation burdens such conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

In considering whether a modern regulation is "relevantly similar" to historical laws, *Bruen* instructed that courts should consider "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. That is, the "central" considerations are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* The government need only identify "a well-established and representative historical *analogue*, not a historical *twin." Id.* at 30. "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

In *United States v. Rahimi*, 602 U.S. 680 (2024), the Court applied the *Bruen* framework to 18 U.S.C. § 922(g)(8)(C)(i), which bars firearm possession for certain individuals subject to protective orders who are found to pose a "credible threat" to the physical safety of an intimate partner or child. The Court rejected the defendant's facial challenge to Section 922(g)(8)(C)(i) because the statute was constitutional as applied to the facts of the defendant's own case. *Rahimi*, 602 U.S. at 693. In reaching its conclusion, the Supreme Court explained that "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.* at 694. The Court focused on two historical analogues—surety laws and "going armed" laws—and evaluated whether these laws

4

supplied sufficient underpinnings for Section 922(g)(8)(C)(i). *Id.* at 695-98. The Court concluded that they did, and that, "the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698. The Court noted that though "Section 922(g)(8) is by no means identical to these founding era regimes, . . . it does not need to be." *Id.* at 698.

### III.  ARGUMENT

### A.     Section 922(g)(1) Does Not Violate the Second Amendment as Applied to Plaintiff

Plaintiff's claim that Section 922(g)(1) violates his Second Amendment rights fails as a matter of law. First, Plaintiff's claim fails at the initial step of the *Bruen* analysis because Plaintiff, as a felon, is not among "the People" protected by the Second Amendment. Second, even if convicted felons like Plaintiff are considered to be among "the People," history and tradition confirm that Congress may disarm them. This history and tradition supports disarmament of felons on a *categorical* basis—that is, without consideration of the particular felony an individual committed.

Four types of historical evidence support the proposition that Section 922(g)(1)'s categorical disarmament of felons fits within this country's tradition of firearm regulation. First, the standard penalty for felonies in the Founding era consisted of death and the extinction of the entirety of the felon's civil and political rights, deprivations far more severe than that imposed by Section 922(g)(1). Second, certain Founding-era laws called for disarmament of individuals convicted of even non-capital crimes. Third, some felon-disarmament laws like Section 922(g)(1) are themselves sufficiently "longstanding" to form part of the Nation's tradition of firearm regulation.

And finally, legislatures have long disarmed categories of persons that pose a danger of misusing firearms, and Section 922(g)(1) rests on such a categorical judgment.

> **1.      Felons are not among "the People" protected by the Second Amendment**

Text and history confirm that regulations disarming felons are consistent with the Second Amendment, in part because felons are not among "the People" protected by the Amendment. *See Voisine v. United States*, 579 U.S. 688, 715 (2016) (Thomas, J., dissenting).

At the Founding, the word "people" meant "those who compose a community." 2 Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773); *see* 2 Noah Webster, *An American Dictionary of the English Language* (1828) ("[t]he body of persons who compose a community"). Consistent with that definition, the Constitution generally uses the term "people" as a term of art to refer to "persons who are part of a national community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). The Second Amendment, in particular, uses "people" to refer only to "members of the political community," not to all persons. *Heller*, 554 U.S. at 580. The Second Amendment thus differs from other constitutional provisions, such as the Due Process and Equal Protection Clauses, that guarantee rights to any "person" regardless of whether that person belongs to the polity. *See* U.S. Const. amend. V; amend. XIV, § 1.

This textual limitation is consistent with the history of the Second Amendment. The Founders codified the right to bear arms in part because they regarded it as an important "safeguard against tyranny." *Heller*, 554 U.S. at 600. Justice Story, for instance, described the right to bear arms as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation

6

and arbitrary power of rulers." 3 Joseph Story, *Commentaries on the Constitution of the United States*, § 1890, at 746 (1833). It is therefore unsurprising that a right that was codified to enable the polity to "resist tyranny," *Heller*, 554 U.S. at 598, would be limited to the members of that polity.

Accordingly, individuals who have been excluded from the political community have also historically been denied the right to bear arms. For instance, noncitizens at the Founding lacked the "rights of members of the polity"; they "typically could not vote, hold public office, or serve on juries," and as the Supreme Court confirmed in *Heller*, they also had no "right to bear arms." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998); *Heller*, 554 U.S. at 635.[2] Likewise, today, federal law disarms certain noncitizens, and those who have renounced U.S. citizenship. *See* 18 U.S.C. §§ 922(g)(5), (g)(7), (y). Similarly, during the Revolution, several States deprived individuals of the right to vote and hold office, as well as the right to bear arms, if they refused to swear allegiance to the new republic.[3] "Insane persons" also have historically lacked the right to vote, hold office, and serve on juries,[4] and the Supreme Court indicated in *Heller* that they are also "disqualified from the exercise of Second Amendment rights." 554 U.S. at 635; *see id.* at 631.

---

[2]    *See, e.g.*, 37 Annals of Cong. 86-87 (Dec. 9, 1820) (statement of Sen. Holmes) ("The rights of an American citizen are . . . to elect, be elected, and bear arms in his defence; they are essential, for, divest him of these, and you divest him of citizenship. He has other essential rights, such as those of property and personal security under the protection of laws fairly administered, but he has these in common with foreigners.").

[3]    *See* Act of June 13, 1777, ch. 756, § 3, *in* 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (James T. Mitchell & Henry Flanders eds., 1903); Act of May 1777, ch. 3, *in* 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821); Act of 1777, ch. 6, § 9, *in* 24 *The Records of North Carolina* 89 (Walter Clark ed., 1905).

[4]    *See* 2 Story, § 578, at 53; *Long v. Bowen*, 23 S.W. 343, 343 (Ky. 1893); *United States v. Haskell*, 26 F. Cas. 207, 210, 212 (C.C.E.D. Pa. 1823) (Washington, J., on circuit).

Criminals, too, are among the traditional categories of persons who are not members of the political community and thus do not enjoy the rights that flow from such membership. That is because an individual who previously belonged to the polity may forfeit that status by violating the social contract that governs the political community. *See* 1 William Blackstone, *Commentaries on the Laws of England 300* (10th ed. 1787); 4 Blackstone 382 ("[H]e who hath thus violated the fundamental principles of government, and broken his part of the original contract between king and people, hath abandoned his connexions with society: and hath no longer any right to those advantages, which before belonged to him purely as a member of the community."). As a leading nineteenth-century scholar explained, "the people in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868); *see Heller*, 554 U.S. at 616.

American legislatures have thus long denied felons the traditional rights of members of the polity, including those expressly secured to "the People" in the Constitution. Under Article I and the Seventeenth Amendment, for example, "the People" elect the House of Representatives and Senate. U.S. Const. art. I, § 2, cl. 1; *see* U.S. Const. amend. XIV, cl. 1. Those provisions guarantee the "right of the people to choose" members of both Houses of Congress. *United States v. Classic*, 313 U.S. 299, 314 (1941). Yet Section 2 of the Fourteenth Amendment confirms that States may deny felons the right to vote, which States have done since the Founding. U.S. Const. amend. XIV, § 2; *see Richardson v. Ramirez*, 418 U.S. 24, 41-56 (1974*); Green v. Bd. Of*

*Elections*, 380 F.2d 445, 450 nn.4-5 (2d Cir. 1967) (Friendly, J.). It remains true today that committing a felony often results in "forfeit[ing] . . . a number of rights" tied to membership in the political community, including "the right to serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019). Legislatures may similarly deny convicted felons the other traditional right of members of the polity: the right to bear arms. The Constitution would make little sense if it allowed legislatures to deny felons the right to vote, *see* U.S. Const. amend. XIV, § 2, yet guaranteed felons the right to possess arms so that they could help "resist tyranny," *Heller*, 554 U.S. at 598.

Moreover, and as noted, the Supreme Court's cases establish that legislatures may disqualify felons from exercising at least some rights that belong to "the people," such as the right to vote. And many other constitutional provisions also use the term "the people" in a manner that excludes felons. For instance, felons are not among "the people" who adopted the Constitution, *see* U.S. Const. pmbl; "the [p]eople" who are entitled to elect members of Congress, *see* U.S. Const. art. I, § 2, cl. 1; U.S. Const. amend. XVII; or "the people" who reserved powers not delegated to the government, *see* U.S. Const. amend. X. So, too, felons disarmed under Section 922(g)(1) are not among "the People" entitled to keep and bear arms.

### 2.    History and tradition confirm that Congress may disarm felons, including Plaintiff, categorically

Regardless of whether felons like Plaintiff are among "the People" entitled to keep and bear arms, history and tradition confirm that Congress may disarm them on a categorical basis. A law that regulates conduct covered by the Second Amendment's text complies with the Amendment if it fits within "the Nation's historical tradition of

firearm regulation." *Rahimi*, 602 U.S. at 689. Four types of historical evidence show that Section 922(g)(1) does so. *First*, the standard penalty for felonies in the Founding era consisted of death, forfeiture of all the felon's property, and extinction of all the felon's rights—deprivations more severe than that imposed by Section 922(g)(1). *Second*, some Founding-era laws disarmed individuals upon conviction even for non-capital crimes. *Third*, felon-disarmament laws like Section 922(g)(1) are themselves sufficiently "longstanding" to form part of the Nation's tradition of firearm regulation. *Heller*, 554 U.S. at 626. *Fourth*, legislatures have long disarmed categories of persons who pose a danger of misusing firearms, and Section 922(g)(1) rests on such a categorical judgment.

### i.    Founding-era criminal punishments more severe than disarmament

"[D]eath was 'the standard penalty for all serious crimes' at the time of the founding." *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (citation omitted). That penalty extended even to non-violent crimes, such as forgery. *See* Act of April 30, 1790, ch. 9, § 14, 1 Stat. 115. "Virginia imposed the death penalty for all sorts of crimes relating to the tobacco trade—including . . . fraudulently delivering tobacco, . . . and smuggling tobacco—as well as for stealing hogs . . . , receiving a stolen horse, and concealing property to defraud creditors." Stuart Banner, *The Death Penalty: An American History* 8 (2002). New York imposed the death penalty for counterfeiting; Pennsylvania, for squatting on Indian land; and South Carolina, for burning timber intended for house frames. *See id.* The New England colonies invoked the death penalty more sparingly, but even they imposed it for property crimes such as burglary and robbery. *See id.* at 7-8.

At common law, felons generally also forfeited their lands, goods, and chattels.

*See* 4 Blackstone 380-89. That rule—which reflected the belief that "property was a right derived from society which one lost by violating society's laws," *Austin v. United States*, 509 U.S. 602, 612 (1993)—took hold in the colonies. *See* Richard E. Finneran & Steven K. Luther, *Criminal Forfeiture and the Sixth Amendment: The Role of the Jury at Common Law*, 35 Cardozo L. Rev. 1, 35-41 (2013). The middle and southern colonies were "receptive to English common law traditions regarding criminal forfeiture, enacting only minor statutory exceptions." *Id.* at 37. The New England colonies, by contrast, were more "active in their attempts to modify the English common law by statute," although "even these colonies ultimately accepted forfeiture." *Id.* at 35.

Finally, a felon who was sentenced to death was deemed "already dead in law" even before his execution. 4 Blackstone 380; *see Troup v. Wood*, 4 Johns. Ch. 228, 248 (N.Y. Chancery 1820) (Kent, Ch.). That status, known as "civil death," involved "an extinction of civil rights, more or less complete." *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888). A convicted felon thus had no "right to vote, to sit as a juror, *to bear arms*, to marry, and [to] hold office." *Id.* at 156 (Earl, J., dissenting) (emphasis added).

Section 922(g)(1) is "'relevantly similar'" to those Founding-era laws "in both why and how it burdens the Second Amendment right." *Rahimi*, 602 U.S. at 698. As for why: Section 922(g)(1), like the Founding-era laws discussed above, applies because an individual has been convicted of a felony. As for how: The burden imposed by Section 922(g)(1) is far more modest than those imposed by Founding-era criminal laws. If legislatures at the Founding could deprive convicted felons of the right to life, the right to own property, and all other civil and political rights, then Congress today certainly may deprive them of the right to possess firearms.

The Supreme Court's decision in *Rahimi* reinforces this. In *Rahimi*, the Court

analogized Section 922(g)(8) to historical "going armed" laws, which forbade menacing others with firearms. *See Rahimi*, 602 U.S. at 697-99. "The going armed laws provided for imprisonment," the Court explained, "and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.* at 699. Similarly, because capital punishment and the denial of all civil and political rights were permissible to respond to the commission of a felony, the lesser restriction of disarmament is also permissible. The *Rahimi* Court observed, in addition, that the going armed laws punished offenders with forfeiture of their arms. *See id.* 697. If the forfeiture of an offender's arms is analogous to temporary disarmament, then the forfeiture of the offender's entire estate is analogous to permanent disarmament.

The criminal laws of the Founding era subjected convicted felons to severe deprivations: death, forfeiture of all property, and total loss of civil and political rights. Because Section 922(g)(1) imposes a far more modest restriction, it complies with the Second Amendment.

### ii. Founding-era laws disarming convicted criminals

Because death was the "standard penalty for all serious crimes" at the Founding, *Bucklew*, 587 U.S. at 129, early legislatures had little occasion to consider whether to disarm convicted criminals who were not executed. But historical evidence shows that legislatures were understood to possess the power to disarm such individuals. *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) ("[The] exclusion of criminals from the individual right to keep and bear arms . . . was understood.").

To begin, "the Revolutionary War led to widespread disarmament of loyalists."

12

*Range v. Attorney General*, 124 F.4th 218, 243 (3d Cir. 2024) (Matey, J., concurring). A New York law provided that a person would "be disarmed" upon conviction for furnishing provisions to the British army or for opposing the authority of the Continental Congress. Resolutions of Sept. 1, 1775, *in* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New-York* 132 (1842). A South Carolina law provided that a person would "be disarmed" upon "due conviction" for bearing arms against, or opposing the measures of, the Continental Congress. Resolution of Mar. 13, 1776, *in Journal of the Provincial Congress of South Carolina, 1776*, at 77 (1776). And a Connecticut law provided that anyone "duly convicted" of seditious libel "shall be disarmed and not allowed to have or keep any arms." Act of Dec. 1775, *in The Public Records of the Colony of Connecticut From May, 1775 to June 1776, inclusive* 193 (Charles J. Hoadly ed., 1890). George Washington discussed the Connecticut law, including its "penalty of being disarmed," in a letter to the Governor of Rhode Island, adding that "the other colonies ought to adopt similar" measures. Letter from George Washington to Nicholas Cooke (Jan. 6, 1776), *in* 3 *The Writings of George Washington* 323 (Worthington Chauncey Ford ed., 1889).

The principle that legislatures could properly disarm convicted criminals persisted after the Revolution. At Pennsylvania's ratifying convention, Anti-Federalists proposed a bill of rights that, among other things, would have prohibited "disarming the people, or any of them, *unless for crimes committed*, or real danger of public injury from individuals." 2 *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added). The Federalists, who considered a bill of rights unnecessary, defeated the proposal, but the Anti-Federalists published it in the "highly influential" Dissent of the Minority of the Convention. *Heller*, 554 U.S. at 604;

13

*see id.* at 624. "Given the Anti-Federalists' vehement opposition" to federal power, *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 664 (2013) (Thomas, J., concurring), it is telling that even they accepted the disarmament of convicted criminals.

Evidence from the early nineteenth century confirms that the Second Amendment was understood to permit disarmament of convicted criminals. In the early 1820s, the Louisiana State Legislature appointed Edward Livingston—"one of our great lawyers," *Green v. United States*, 356 U.S. 165, 213-214 (1958) (Black, J., dissenting)—to draft a code of criminal law for the State. *See* Elon H. Moore, *The Livingston Code*, 19 J. Am. Inst. Crim. L. & Criminology 344, 345, 354 (1928). Livingston's code abolished the death penalty, but listed the "suspension" and permanent "forfeiture" of "political or civil rights" among the punishments that courts could impose. Edward Livingston, *A System of Penal Law for the State of Louisiana* 26 27 (1824). The "civil rights" that could be suspended or forfeited included the "right of bearing arms in defence of the country." *Id.* at 29. For example, the code authorized courts to impose one year of imprisonment and five years of disarmament for fraudulent interference with an inheritance, *see id.* at 138, and fifteen years' imprisonment and permanent disarmament for forgery, *see id.* at 73.

Livingston later proposed a similar penal code for the United States, and he included similar provisions concerning forfeiture of the right to bear arms. *See* Edward Livingston, *A System of Penal Law for the United States* 19-20, 40, 79, 126 (1828). A congressional committee also copied much of Livingston's work, including its provisions concerning forfeiture of the right to bear arms, in a draft criminal code for the District of Columbia. *See A System of Civil and Criminal Law for the District of Columbia, and for the Organization of the Courts Therein*, S. Doc. No. 85, 22d Cong., 1st Sess. 308-09,

14

328, 340, 388 (1833). Livingston's proposals won wide acclaim. *See* Moore, *supra*, at 355. Chief Justice Marshall wrote to Livingston: "Among your penalties a deprivation of civil and political rights is frequently introduced. I believe no former legislator has relied sufficiently on this provision; and I have strong hopes for its efficacy." Letter from John Marshall to Edward Livingston (Oct. 24, 1825), *available at* https://perma.cc/7A6W-GXK5.

Although Livingston's codes were not adopted, the Supreme Court and Justice Scalia have cited their provisions as evidence of the types of laws that would have been considered permissible at the Founding. *See Beauharnais v. Illinois*, 343 U.S. 250, 255 n.4 (1952); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 294 (1990) (Scalia, J., concurring). Here, the codes suggest that legislatures were understood to possess the power to disarm convicted criminals.

In summary, the colonies disarmed certain convicted criminals before ratification; even Anti-Federalists accepted disarmament of criminals during ratification; and leading lawyers saw no constitutional problem with disarming convicted criminals after ratification. Accordingly, the Second Amendment's original meaning allows Congress to disarm convicted criminals.

### iii. Longstanding and widespread felon-disarmament laws

Laws prohibiting convicted criminals from possessing firearms are themselves sufficiently "longstanding" to form part of the Nation's tradition of firearm regulation. *Heller*, 554 U.S. at 626. To begin, the United States has a century-old tradition of disarming *violent* criminals, regardless of whether their crimes constitute felonies. In the 1920s and 1930s, multiple jurisdictions began prohibiting anyone with a conviction

for a "crime of violence" from possessing a handgun.[5] In 1938, Congress enacted a nationwide prohibition on the receipt of a firearm by anyone with a "crime of violence" conviction. *See* Federal Firearms Act, ch. 850, § 2(d), 52 Stat. 1250, 1251 (1938). Those early laws did not distinguish between violent felonies and misdemeanors. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), *cert. denied*, 562 U.S. 1303 (2011).

The United States also has a century-old tradition of disarming convicted *felons*, regardless of whether their crimes are violent. In the 1920s and 1930s, legislatures prohibited the possession of handguns by those who had been convicted of felonies against person or property (including nonviolent property crimes such as theft).[6] Other legislatures began to prohibit the possession or purchase of handguns by felons in general.[7] Congress followed the latter model in 1961, prohibiting receipt of firearms by anyone convicted of a crime punishable by more than a year of imprisonment. *See* Act of Oct. 3, 1961, Pub. L. No. 87 342, §2, 75 Stat. 757. In 1968, Congress enacted Section 922(g)(1), broadening the prohibition to cover possession as well as receipt. *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220.

Today, at the federal level, Section 922(g)(1) is by far the most applied firearm disqualification in Section 922(g). In addition, every State and territory has enacted

---

[5]    *See* Act of Apr. 22, 1927, ch. 1052, § 3, 1927 R.I. Acts & Resolves 257; Act of Apr. 27, 1927, No. 206, § 4, 1927 Haw. Terr. Sess. Laws 209; Act of June 10, 1931, No. 158, § 4, 1931 Pa. Sess. Laws 498; Act of Mar. 14, 1935, ch. 208 § 4, 1935 S.D. Sess. Laws 355; Act of Mar. 23, 1935, ch. 172, § 4, 1935 Wash. Sess. Laws 599; Act of Apr. 6, 1936, No. 82, § 4, 1936 Ala. Gen. Laws 51.

[6]    *See* Act of Mar. 7, 1923, ch. 266, § 5, 1923 N.D. Laws 380; Act of May 4, 1923, ch. 119, § 3, 1923N.H. Laws 138; Act of June 13, 1923, ch. 339, § 2, 1923 Cal. Stat. 696; Act of Feb. 26, 1925, ch. 260, § 2, 1925 Or. Gen. Laws 468; Act of Mar. 12, 1925, ch. 207, § 4, 1925 Ind. Laws 495-96.

[7]    *See* Act of Apr. 29, 1925, ch. 284, § 4, 1925 Mass. Acts 323; Act of June 2, 1927, No. 373, § 2, 1927 Mich. Acts 887-888; Act of June 19, 1931, ch. 1098, § 2, 1931 Cal. Stat. 2316.

some form of felon-disarmament law—*i.e.*, a law that disqualifies individuals from possessing, carrying, or buying firearms because of felony convictions. Thirty-nine States, the District of Columbia, and five territories have enacted felon-disarmament laws that cover felony convictions in general.[8] Felon-disarmament laws in the remaining eleven States cover specific types of crimes.[9]

The century-old, nationwide tradition of disarming convicted felons (including non-violent felons) resolves this case. Although post-ratification evidence cannot overcome clear constitutional text, "the Framers themselves intended that post-ratification history would shed light on the meaning of vague constitutional text." *Rahimi*, 602 U.S. at 725 (Kavanaugh, J., concurring). And the Supreme Court has often relied on post-ratification history, including history from long after the Founding, in resolving constitutional ambiguities. *See*, *e.g.*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 75 (2022) ("[F]or the last 50-plus years, federal, state, and local jurisdictions have repeatedly relied upon on-/off-premises distinctions."); *NLRB v.*

---

[8]    *See* Alaska Stat. Ann. § 11.61.200(a)(1); Am. Samoa Code Ann. § 46.4221(b)(1); Ariz. Rev. Stat. Ann. § 13-904(A)(5); Ark. Code Ann. § 5-73-103(a)(1); Cal. Penal Code § 29800(a)(1); Colo. Rev. Stat. Ann. § 18-12-108(1); Conn. Gen. Stat. § 53a-217(a); Del. Code Ann. tit. 11, § 1448(a)(1); D.C. Code Ann. § 22-4503(a)(1); Fla. Stat. Ann. § 790.23(1); Ga. Code Ann. § 16-11-131(b); Haw. Rev. Stat. § 134-7(b); 10 Guam Code Ann. § 60108(b)(1); 720 Ill. Comp. Stat. 5/24-1.1(a); Ind. Code Ann. § 35-47-2-3(i)(1); Iowa Code Ann. § 724.26(1); Ky. Rev. Stat. Ann. § 527.040(1); Me. Rev. Stat. Ann. tit. 15, § 393(1)(A- 1)(1); Md. Code Ann. Pub. Safety §§ 5-101(g)(2), 5-133(b)(1); Mass. Gen. Laws Ann. ch. 140, § 129B(1)(1)(A) and (ii)(A); Mich. Comp. Laws Ann. § 750.224f (1); Minn. Stat. Ann. § 624.713, subdiv. 1(10)(i); Miss. Code Ann. § 97-37-5(1); Mo. Rev. Stat. § 571.070.1(1); Neb. Rev. Stat. Ann. § 28-1206(1)(a)(i); Nev. Rev. Stat. Ann. § 202.360.1(b); N.H. Rev. Stat. Ann. § 159:7; N.J. Stat. Ann. § 2C:58-3(c)(1); N.M. Stat. Ann. § 30-7-16(A); N.Y. Penal Law § 400.00(1)(c); N.C. Gen. Stat. Ann. § 14-415(b)(5); N.D. Cent. Code Ann. § 62.1-2-1(1)(b); 6 N. Mar. I. Code § 10610(a)(3); Okla. Rev. Stat. tit. 21, § 1283(A); Or. Rev. Stat. Ann. § 166.270(1); P.R. Laws Ann. tit. 25, § 462a(a)(2); Tenn. Code Ann. § 39-17-1307(c); Tex. Penal Code Ann. § 46.04(a); Utah Code Ann. § 76-10-503(1); Va. Code Ann. § 18.2-308.2(A)(i); V.I. Code Ann. tit. 23, § 456a(a)(1); Wash. Rev. Code Ann. § 9.41.040(2)(a)(i)(A); W. Va. Code Ann. § 61-7-7(a)(1); Wis. Stat. Ann. § 941.29(1m)(a)-(b); Wyo. Stat. Ann. § 6-8-102(c).

[9]    *See* Ala. Code § 13A-11-72(a)(1); Idaho Code Ann. § 18-310(2); Kan. Stat. Ann. § 21-6304(a); La. Stat. Ann. § 14:95.1(A); Mont. Code Ann. § 45-8-313(1); Ohio Rev. Code Ann. § 2923.13(A)(2)-(3); 18 Pa. Stat. & Cons. Stat. Ann. § 6105(a)(1) and (b); 47 R.I. Gen. Laws Ann. § 11-47-5(a)(1); S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 22-14-15; 13 Vt. Stat. Ann. § 4017(a).

*Noel Canning*, 573 U.S. 513, 533 (2014) ("[T]hree-quarters of a century of settled practice is long enough.").

The tradition of disarming convicted felons carries added force here because it is not only a century old, but also widespread. "Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (citation omitted) (Scalia, J.). As a result, a law that "has the validation of long, accepted usage" and that "has become general throughout the United States" "bears a strong presumption of constitutionality," *Doe v. Reed*, 561 U.S. 186, 221 (2010) (Scalia, J., concurring in the judgment) (citation omitted). Such a "universal and long-established" practice should take precedence over "historical and academic speculations" about what inferences to draw from an inconclusive Founding-era record. *McIntyre v. Ohio Election Comm'n*, 514 U.S. 334, 377 (1995) (Scalia, J., dissenting).

Felon-disarmament laws are so much a part of the fabric of this country's historical traditions that the Supreme Court has repeatedly emphasized that such laws are "presumptively lawful." In *Heller*, for example, the Supreme Court held that the Second Amendment protects the right to keep and bear arms for self-defense. 554 U.S. at 636. The Court explained, however, that this right "is not unlimited." *Id.* at 626. In particular, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* It described felon-disarmament laws—along with laws disarming persons with mental illnesses, laws excluding firearms from sensitive places, and laws regulating firearms sales—as "presumptively lawful regulatory measures." *Id.* at 627 n.26; *see id.* at 626-27. The Court stated that those "exceptions" had "historical justifications," which the Court

18

would have "time enough to expound upon" "if and when those exceptions come before" it. *Id.* at 635.

*Heller*'s approval of felon-disarmament laws rested on the Supreme Court's evaluation of the historical record. Justices have emphasized that the Court in *Heller* "recognized that history supported the constitutionality" of laws "prohibiting possession by felons." *NYSRPA v. City of New York*, 590 U.S. 336, 364 (2020) (Alito, J., dissenting). That is, the Court determined that the "traditional exceptions to the right" include "'longstanding prohibitions on the possession of firearms by felons.'" *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring); *see Heller v. District of Columbia*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("*Heller* affirmatively *approved* a slew of gun laws," including "felon-in-possession laws," "based on a history-and-tradition-based test . . . .").

*Heller*'s approval of felon disarmament constitutes binding precedent. "In the American system of *stare decisis*," courts must follow "both the result and the reasoning of a prior decision." *Ramos v. Louisiana*, 590 U.S. 83, 125 n.6 (2020) (Kavanaugh, J., concurring in part). *Heller*'s approval of felon disarmament was essential to its result: the Supreme Court ruled that the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights," meaning that he was "not a felon" and "not insane." 554 U.S. at 631, 635. And *Heller*'s discussion of the limits of the right to possess arms also formed an important part of its reasoning: it showed that reading the Second Amendment to protect an individual right would not imperil longstanding and widespread firearm laws. *See id.* at 626-28.

The Supreme Court's later decisions reinforce this understanding of the Second Amendment. In *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), a plurality of the

Court repeated the *Heller* Court's "assurances" that nothing in its holding casts doubt on "such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *Id.* at 786 (citation omitted). In *Bruen*, two Justices reiterated *Heller*'s approval of "longstanding prohibitions on the possession of firearms by felons." 597 U.S. at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring). Another Justice emphasized that *Bruen* did not "disturb[] anything that [the Supreme Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 72 (Alito, J., concurring). And three other Justices described *Heller*'s discussion of felon disarmament as an "aspect of *Heller*'s holding." *Id.* at 129 (Breyer, J., joined by Sotomayor and Kagan, J.J., dissenting). More recently, in *Rahimi*, the Supreme Court—in an eight-Justice majority opinion—repeated *Heller*'s statement that laws disarming "felons" are "presumptively lawful," and it relied on that statement in concluding that the Second Amendment permits some regulations banning the possession of firearms in the home. *Rahimi*, 602 U.S. at 699 (quoting *Heller*, 554 U.S. at 626, 627 n.26).

### iv.  Laws disarming dangerous persons on a categorical basis

The United States has a longstanding tradition of disarming persons whose possession of firearms pose a danger to themselves or others. *Rahimi* focused on one aspect of that tradition: disarmament based on a court's finding that a particular individual poses such a danger. *See Rahimi*, 602 U.S. at 690. Plaintiff's challenge to Section 922(g)(1) involves another aspect of that tradition: disarmament of "categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 698; *see McDonald*, 561 U.S. at 786; *Heller*, 554 U.S. at 626; *United States v. Torres-Rosario*,

658 F.3d 110, 112-13 (1st Cir. 2011).

Beyond the Founding-era disarmament laws that categorically disarmed groups such as loyalists, *see supra* at Section I(B)(b), throughout the nineteenth century, American legislatures disarmed classes of individuals who posed (or were thought to pose) a danger of misusing firearms. At least twenty-nine jurisdictions banned or restricted the sale of firearms to, or the possession of firearms by, individuals below specified ages.[10] Several states banned the sale of firearms to persons of unsound mind.[11] At least a dozen states disarmed "tramps"—that is, vagrants.[12] And some states forbade intoxicated persons from buying or carrying firearms.[13]

State courts upheld those laws, even though the laws were categorical in nature— *i.e.*, they did not require an individualized assessment of danger. The Missouri Supreme Court, for example, upheld a ban on carrying arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to bear arms because that right "was never intended as a warrant for vicious persons to

---

[10]    *See, e.g.*, Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83.

[11]    *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[12]    *See, e.g.*, Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30.

[13]    *See, e.g.*, Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (Ohio 1900).

The tradition of making such categorical judgments continued into the twentieth century. In the 1930s, Congress disqualified fugitives and persons under felony indictment. *See* Federal Firearms Act, ch. 850, § 2(e)-(f ), 52 Stat. at 1251. In the 1960s, Congress disqualified drug users, drug addicts, and persons with mental illnesses. *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. at 1220. In the 1980s, Congress disqualified noncitizens who are unlawfully present in the United States and persons who have been dishonorably discharged from the Armed Forces. *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102(5)(D), 100 Stat. 452 (1986). And in the 1990s, it disarmed domestic-violence misdemeanants. *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, tit. VI, § 658(b)(2), 110 Stat. 3009, 3009-372. In short, legislatures' power to make categorical judgments about danger is one of "the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

Section 922(g)(1) is consistent with that tradition of imposing categorical limits on the right to keep and bear arms. As courts have recognized, empirically, convicted felons—including ones who committed offenses that do not involve violence—are more likely than ordinary, law-abiding citizens "to engage in illegal and violent gun use." *Kanter v. Barr*, 919 F.3d 437, 448 (7th Cir. 2019) (reviewing cases and studies) (quotation marks omitted), *abrogated on other grounds by Bruen*, 597 U.S. 1; *see also Binderup v. Attorney General*, 836 F.3d 336, 400 (3d Cir. 2016) ("[N]umerous studies" show a "link between past criminal conduct and future crime, including gun violence.") (Fuentes, J., concurring in part), *cert. denied*, 582 U.S. 943 (2017); *see id.* at 400 n.160; *Torres-Rosario*, 658 F.3d at 113 ("It is well-established that felons are more likely to

commit violent crimes than are other law-abiding citizens." (quoting *United States v. Barton*, 633 F.3d 168, 175 (3d Cir. 2011))). For example, the evidence reflects that fraud and forgery offenders commit future violent crimes at a rate approaching that of similarly situated individuals convicted of burglary and drug offenses. *Folajtar v. Attorney General*, 980 F.3d 897, 909 (3d Cir. 2020). For decades, Congress has not deviated from its reasonable determination that felony convictions broadly, not just violent felonies, are disqualifying. *See, e.g.,* H.R. Rep. No. 87-1202, at 2 (1961) (touting the inclusion of felonies generally as "an integral part of an anticrime legislative program" that would respond to pressing "national concern" by "mak[ing] it more difficult for the criminal elements of our society to obtain firearms").

To reject Plaintiff's challenge to Section 922(g)(1), this Court need only recognize that Congress may disarm individuals who have been convicted of crimes that satisfy the common definition of a felony—that is, crimes punishable by imprisonment for more than one year. In interpreting other provisions of the Bill of Rights that require courts to distinguish among different types of crimes, the traditional focus has been on the "maximum authorized penalty" rather than on "the particularities of an individual case." *Lewis v. United States*, 518 U.S. 322, 328 (1996) (alteration and quotation marks omitted). For example, the Grand Jury Clause applies only to "capital" or "infamous" crimes, U.S. Const. amend. V, and a crime is "infamous" if it is punishable by "imprisonment for more than a year," *Branzburg v. Hayes*, 408 U.S. 665, 687 n.24 (1972). The Sixth Amendment right to a jury trial similarly does not extend to petty offenses, and an offense is petty if it is punishable by a prison term of six months or less. *See Blanton v. City of North Las Vegas*, 489 U.S. 538, 541-45 (1989). A similar approach is appropriate in interpreting the Second Amendment, which is subject to the

same "body of rules" as "the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (quotation marks omitted).

When a person—like Plaintiff—has been convicted of a crime punishable by more than one year of imprisonment, a court need not inquire further into the nature of the crime in order to determine whether disarmament is justified. Rather, the maximum authorized penalty for the offense by itself establishes that the crime is of a type serious enough such that one who has committed it has placed himself among the "categories of persons thought by a legislature to present a special danger of misuse," *Rahimi*, 602 U.S. at 698, and thus eligible for disarmament.

## B.     This Court's recent Second Amendment jurisprudence further supports dismissal

Earlier this year, in *Taker v. Bondi*, 2:24-cv-00369-LEW, 2025 WL 1883701 (D. Me. July 8, 2025), this Court dismissed an as-applied Second Amendment challenge raising issues overlapping with those asserted by Plaintiff here. Although the *Taker* case involved a plaintiff who was convicted of a federal marijuana trafficking crime (and who, for good measure, was also subject to a state court protection from abuse order), *see id.* at *1, the reasoning of that decision should apply with equal force here.

"Even assuming that under the *Bruen* framework the Supreme Court would now conclude that a law barring nonviolent, marijuana-trafficker felons from possessing firearms comes within the Second Amendment—assuming only because the Court may conclude that such felons are not among 'the people' protected by the Amendment," this Court held that "the prohibition against firearm possession by felons is consistent with our Nation's historical tradition and is, consequently, lawful." *Taker*, 2025 WL 1883701. at *2. While "the question may be debatable," such debate "would appear exceedingly

24

academic in light of Chief Justice Roberts and Justice Kavanaugh's admonition that 'nothing in [the *Bruen*] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons. . .'" *Id.* (citations omitted). As in *Taker*, "[t]his does not bode well at all" for Plaintiff's instant challenge to the felon-in-possession law codified at 18 U.S.C. § 922(g)(1). *Id.* As in *Taker*, too, this case should be dismissed.

## CONCLUSION

For the foregoing reasons, the Government requests that the Court dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated: December 9, 2025    Respectfully submitted
   Bangor, Maine

         ANDREW B. BENSON
         UNITED STATES ATTORNEY


          /s/ Andrew K. Lizotte
         Andrew K. Lizotte
         Civil Chief
         U.S. Attorney's Office
         202 Harlow St.
         Bangor, ME 04401
         (207) 262-4636
         Andrew.Lizotte@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2025, I electronically filed the foregoing using the CM/ECF system, which will send an electronic notification of such filing to all counsel of record. A copy has additionally been served by U.S. Mail on:

NATHAN REARDON
P.O. BOX 52
DETROIT, ME 04929
PRO SE

ANDREW B. BENSON
UNITED STATES ATTORNEY

/s/ Andrew K. Lizotte
Andrew K. Lizotte
Civil Chief
U.S. Attorney's Office
202 Harlow St.
Bangor, ME 04401
(207) 262-4636
Andrew.Lizotte@usdoj.gov